Good morning, Your Honors. My name is Daniel Krasner, and I appear here as counsel for Plaintiff Appellant Mr. Turner. This case has both procedural and substantive complexities, and I will try to address the most elemental issues in the case, which I perceive as being the following. First of all, did the District Court commit error in dismissing the Second Amended Complaint on the grounds that it failed to satisfy the standards of Section 36B and the probability or possibility of plaintiff proving his claims? Second, if the District Court correctly dismissed the complaint, should the District Court have permitted the plaintiff to submit an additional complaint satisfying the deficiencies that the District Court found in the original complaint? Third, if the District Court properly, which we believe it did not, not permit the plaintiff to amend his complaint and submit an additional pleading, when the plaintiff applied under Section 59E and Section 15 for the opportunity to submit an additional complaint and submitted a Second Amended Complaint along with the motion, did the District Court err in denying the plaintiff the opportunity to submit that complaint? And did the District Court err entirely in failing to even review and consider whether the Second Amended Complaint satisfied the pleading requirements? That's the procedural morass we kind of have here. On a substantive error, the principal issue here is, has plaintiff pleaded either in the Second or First Amended Complaint sufficient facts to support the claim that the advisory fees that the advisor here, the Davis Fund advisor, charged the fund were excessive and could not have been the outcome of arm's-length negotiation between the fund's board of directors and the management company? To assess that, don't we need to know more than any of your complaints tell us about the services that were rendered so that you can assess the relationship between the size of the fees and the services actually rendered? And unless I missed it, even in your Second Amended Complaint, you just refer to research, managing the portfolio, providing back office support, but you don't really get into any detail. And given Iqbal and the other requirements for what needs to be pleaded to be plausible, don't we need to know that, even on the face of the complaint? Your Honor, these large funds, the services that were provided by each one of the comparative funds and all of the funds in this particular area are the same. There's no distinction between the services. It's not like, for example, in the Gartenberg case where you're dealing with a money market fund and some funds provided check writing privileges, others didn't. Some funds provided special services. There were no special services provided by any of the funds that we compared this fund to or any of the other funds in that category. Where in your complaint do you specify the services that were rendered in any of your complaints? I think it's elemental that there were no differences in those services. There was one material difference, and that we emphasize, and that difference was the performance of the fund and what kind of effort— Just so I have learned a great deal from watching Judge Hawkins put questions, answer this question yes or no. Is there any place in any of your complaints where you describe with specificity the services rendered? No, there is no specific thing that goes through all of the services, but there is a great deal of allegations with respect to the most important service, and that is the management of the fund's portfolio. Can I follow on to my colleague's question? My understanding of the standard here is to establish that the fees were, in fact, disproportionate. The fee must be so disproportionately large that it bears no relationship to the services rendered and could not have been the product of arm's length bargaining. That is correct. Is that the correct standard? That is correct. If we don't know what the services are, how do we satisfy that standard? The principal service, Your Honor, is the management of the fund's portfolio. That is the paramount service and overwhelms all of the other services that a mutual fund of this character could provide. By the way, when I read that standard, I wish that had been the standard by which my fees in private practice were judged. But go ahead. And as to that service, this fund performed extremely poorly compared to its competitors or peers, and we allege that in great detail and we demonstrate that over the period of the five years that we look back from the date of the complaint, this fund performed worse than any of the other comparable funds. And there was a significant factor with respect to many of them, a factor of two, three, and four times. So this fund performed poorly with respect to its peers. Is it your position that merely because the fees went from $88 million to $224 million over a five-year period, for the purposes of your complaint, that's enough? No. It is not my position. My position is that we have to look at several factors which are sometimes referred to as the Gartenberg factors. And I'd like to start with the one factor that the Congress deemed to be the most important factor when it enacted Section 36B, and that is economies of scale. And I would ask the Court to turn to page 8 of my brief and the chart that appears there, because that chart, although it's fairly simple, illustrates the failure of this management company to share its economies of scale. If you look at this chart, you will notice that there is a somewhat small scale down of the fees for every several billion or, in some cases, even $8 or $10 billion worth of increase in the size of the fund. Now, the Court should keep in mind that for every billion dollars that the fund increased in size, the management fees to the advisor increased by approximately $5 million. Now, what they did is they scaled down, for example, between $3 and $4 billion. They scaled down from .55 to .54. Now, that scale down results in a reduction in the fee for that billion dollars of $100,000. So, for every $5 million that the advisor put in its pocket, it took out $100,000 and gave it to the fund. Now, that is certainly not a sharing of the economies of scale, which we allege in great detail in the complaint what those economies were in several different areas. First of all, in the area of services other than the management, as these mutual funds became more and more computerized, it cost less and less for the advisor to provide additional information and material and to service the customers, i.e., the investors in the fund. Because once you have all of this thing computerized, adding additional investors and additional money into the fund requires very little, if any, additional cost. But more importantly, in terms of the performance of the fund and in terms of managing the fund's portfolio, as the fund grew larger and larger, the fund didn't invest in more and more different securities. The fund kept investing in the very same securities because the fund had limited itself, or the advisor had limited the fund, to essentially the 200 largest domestic companies. All of these are companies that are in the S&P 500 Index. All of these are companies that are extremely well known. All of these are companies that are easily traded on the national exchanges. And all the advisor did, instead of buying a million shares of one of these companies, it bought 1,100,000 shares. No additional expense to the advisor in buying those additional 100,000 shares. So as the fund grew larger and larger, these $100,000 tips that the advisor returned to the fund's shareholders were nowhere near a sharing of these economies of scale. And the economies of scale were almost unique to this kind of a fund because of its size, because of the limits it placed on its portfolio, and because of the fact that these limits were such that it involved less and less expense to manage this kind of a portfolio. Now, for example, and we allege this, one of its competitors, one of its peers, was the Fidelity Growth Fund. The Fidelity Growth Fund was approximately the same size, had lower management fees, but the Fidelity Fund invested in over 300 different securities, while this fund invested in actually 86 at the comparative period. So Fidelity had much greater expense in terms of research, much greater expense in terms of trading, because it purchased a lot of smaller companies in smaller volume. But nevertheless, this fund, as it grew, did not share its economies of scale with its investors, with the fund itself. Now, another one of the factors that the Gartenberg Court talks about is comparison of fees charged by this fund to its shareholders and compare that to the fees that were charged by comparable funds. And the district court held or found that you basically were comparing apples and oranges, right? That, Your Honor, the district court said that when we used the Vanguard funds, that was a comparison of apples and oranges. The Vanguard funds are identical with these funds. There is no difference between how these funds were managed and how Vanguard managed its fund. The only difference was that Vanguard was owned by the fund company itself. So the Vanguard, in effect, could be a low-cost competitor. Now, the Vanguard fees were actually less than half of the fees that this fund charged. But that is an indicator of the fact that the cost of providing these services was far, far less than this management company charged. That's all. It's not that Vanguard was a different kind of fund. It was identical. These were identical funds. One of them was a large blend fund. One was a large growth fund. They were both in both the size category and the nature of the services they provided were the same. The only difference between the Vanguard management company and this one is this company was out to make a lot of money. And the Vanguard management company was not in that category. It was out to service the investors. Sir, you are actually over your time. If you have another point you want to wrap up with, that's fine, and I'll give you a couple minutes for rebuttal. But I just want to alert you that you've used up all of your time already. One of the other factors that we emphasize is the fact that the directors of this fund were essentially supine. It appears from the facts that were available to us at the time that the directors of this fund did not negotiate at all at arm's length with the management company. And we allege that in connection particularly with an event that occurred two months after we filed the amended complaint. And the event that occurred is the management company came to the directors and said, you know what, we're going to reduce the fees that we charge by $750,000 going forward. It wasn't the directors that requested it. It wasn't the directors that negotiated it. It was the management company in the face of our first amended complaint going ahead and voluntarily reducing the fees. There is no evidence that we're aware of, and we so allege in the complaint, that the directors had any role at all in the negotiation of this reduction. Okay. Thank you. I'm going to stop you there. We'll hear from your opponents, and we'll give you, as I said, a couple of minutes for rebuttal. Good morning. My name is Steve Topetsis, and I represent Davis Selected Advisors and Davis Distributors. Section 36B of the Investment Company Act confers a narrow private right of action. As Judge Hawkins observed a moment ago, and as the Supreme Court said in Jones v. Harris, to face liability, an investment advisor must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. The amended complaint, the initial complaint, the amended complaint, the proposed second amended complaint, each fail to meet that high burden. The hurdle imposed on prospective plaintiffs, on plaintiffs relative to 36B, is a high one. Before talking about the legal standards that govern the issues presented in this appeal, I'd like to talk a little bit about the backdrop and the context here, because it shapes our perspective of the case, and we think it ought to shape the manner in which these things are considered on appeal. So let me ask you something, though. Your adversary concedes that they do not specify the services, but he says, in effect, you can evaluate those circumstantially by comparison with other similarly situated funds. So if you see several funds out there, all of which have more or less the same kind of investment strategy, and the service fees in all the others in my hypothetical, let's say, are a quarter of what yours are, sure, you don't know exactly what they're doing, but a reasonable fact finder could infer that it could not possibly be so different that it justified that differential. So I'm studying more extreme in my hypothetical, but what about that argument? If I embrace that hypothetical conceptually, the complaints here fall well short of that mark, Judge Rakoff. The plaintiff's appellant in this circumstance offers generalized allegations regarding disproportionality, excessiveness, but no texture, no facts that would support that. The courts have consistently been critical of that sort of shortfall on the part of a plaintiff. The plaintiff appellant here makes generalized allegations regarding large mutual funds that are grounded in this arithmetical reality that a mutual fund that grows to a certain size and pays an asset-based fee is going to pay a greater amount. That's not what 36B is about. 36B is about fees that are so disproportionately large that they bear no reasonable relationship to the services and could not be the product of arm's-length bargaining. The comparisons that were folded into the amended complaint and that are folded into the proposed second amended complaint are inapt comparisons for reasons that we identified in our briefing relative to the second motion to dismiss for reasons that were articulated by Judge Tashima sitting by designation as the U.S. District Court for the District of Arizona in his memorandum opinion, and they're precisely the kinds of inapt comparisons that Justice Alito talked about and warned against in Jones. They are apples to oranges. Beside all of that, and we can say this based on public filings and other things of which the district court properly could take judicial notice at the initial pleading stage, as we set forth in our papers, and I'll direct the court to page 55 of our brief, two of the examples cited by the plaintiff appellant actually have lower fee structures than the Davis New York Venture Fund, the fund at issue in this case. But Section 36B, the Investment Company Act generally, the SEC regime that regulates the mutual fund industry, don't contemplate a cause of action that seeks to ensure fee parity. You need to say more about the services, about the costs. Economies of scale, this is a superficial argument they offer relative to economies of scale. This fund has a breakpoint schedule that compares favorably with the industry. There's no requirement that there be breakpoints, but this fund has them. In the second amended complaint, or proposed second amended complaint, the plaintiff appellant purports to rely on various Morningstar data. Morningstar is a research firm that's well regarded as a commentator and profiler of the mutual fund industry. They cherry-picked and they've made some isolated observations regarding those Morningstar reports. The thing they omit, and that we highlight in our brief, and we think this is manifest in terms of undermining the proposed claims here, is that Morningstar says this mutual fund, the very fund that is the subject of all three complaints prepared by this plaintiff, is among the cheapest front-end load, large-cap value alternatives. That, we respectfully submit, is not what Section 36B contemplates. It's a high bar for the plaintiffs. Can I ask you this? Am I wrong in thinking that at the, if you just boil down to its essence, what they're really saying is that you guys are basically running this thing like an index fund, but you're charging fees commensurate with an actively managed fund. So, when we look at the fees that index funds charge, they're way below this. So, at the pleading stage, isn't that enough to get us past the 12B6? If they had a good faith basis, and there were real allegations that supported that index fund comparison, it's an inapt and groundless comparison in this case. They're careful with their language, and they talk about it performing in a manner that's similar to an index fund, etc. The services are different. There's no responsible allegation, and no allegation in the complaints here that would withstand scrutiny, that this is an index fund. Well, but I hear you. I know that's your position, but at the motion to dismiss stage, can we really resolve that? Isn't that something that we'd have to have discovery on, and then eventually at summary judgment, maybe you're right. But, I mean, let me just give you a hypothetical. It's silly, but let's say that I allege that instead of actively managing this fund, you guys are back there throwing darts at a board, but you're charging fees as though you were doing all this research. And I allege that. You might say that's a flat-out lie. We're diligently back there scouring all this stuff, but at the motion to dismiss stage. And they would say that's a factual issue, and we ought to have the benefit of discovery on that point. The index fund comparison is belied by a reference to public filings. The fund makes available its annual and semi-annual reports, which reflect portfolio holdings. You can look at those holdings, and you can see that they don't mirror the index benchmark of this fund, which is the S&P 500. The idea that the performance might be comparable for certain periods to the index, that's not supportive of a claim. You can look at things... Let's put performance and comparisons aside. Help me a little bit here. How are these fees billed? How are they billed? Yeah, how does someone like Turner find out what the fees are? There are public disclosures, Judge Hawkins. There's a registration statement that's filed with the SEC through the EDGAR system. There are periodic reports that are sent to shareholders, annual and semi-annual reports. There may be other periodic mailings that reflect... Do those describe what services were provided? They talk about the management of the fund. Isn't it fair to say they don't describe in any specificity the services rendered? I'm not sure that's fair. That may go too far, Judge Rakoff. They do not break down the work that analysts are doing in evaluating potential portfolio holdings, or whether to add to or trim a position, that sort of thing. That kind of qualitative back and forth. It does describe the investment objective of the fund. It does describe in periodic reports what impacted favorably or unfavorably the periodic performance of the fund. And to that degree, some description of what the advisor is doing might seep into those disclosures. But the answer to your question concerning fees is there are public disclosures regarding those things, and they're filed as part of reports. This mutual fund has an independent auditor, I believe it's Deloitte, that prepares audited financials. Those are also publicly disclosed. Your contention in your dismissal motions is that they haven't described the services provided, and that's fatal. They haven't described the services. They haven't described other facts. Stop at services. Correct. Your position is they didn't do it, that's fatal. How are they supposed to know that? That is the description of the actual services provided. How is their client supposed to know that? They would have to have a good faith basis for doing it, or other facts that would serve as a proxy to create the type of inference that Judge Rakoff referenced earlier. They haven't done it here, and respectfully, we think these are not even close to the mark. Can somebody in Mr. Turner's position pick up the phone and call your client and say, hey, I'm in this fund, and I noticed your fees went up by a factor of 4X. Can you tell me what you did, or what caused this, or how come they went up so high? Certainly the appellant could do that, Judge Hawkins. I think for purposes of 36B, this plaintiff, any plaintiff, could look more broadly at mutual fund economics based on public filings and other things, and could see that this fund compares very favorably in terms of expense ratio. I'm talking about the results and comparisons. Your complaint is, they didn't say what the services were, and my question is, how are they supposed to know that? They have to go based on what's available to them. I understand the question. So their complaint would have been okay if they had quoted in hype verba the contents of the public statement? No, they would have had to have a good faith basis. The disclosures of this fund are comparable to the industry. I'm not saying there's anything wrong with the disclosures. I'm just trying to get, I'm trying to unpack this contention about the failure to describe the services rendered. How is someone in Turner's position supposed to know that?  This is a related question. Is there any provision comparable to what you would have in a derivative action against a Delaware corporation where you could first make a demand for information before you went forward with your complaint? Is there any comparable route available to the plaintiffs here? No, Judge Rakoff. These are derivative cases, but the demand requirement and the futility calculus are not applicable here. They would have the basis of information regarding the services in terms of what stocks or bonds were selected, how much cash was maintained, how the manager navigated either a challenging interest rate environment or a market break of one type or another, and you could make allegations based on that. That's what other people do. Our attack on the complaint, though, is not confined just to an inadequate description of the services. It spills over into a failure to discuss costs, a failure to discuss profitability, other than to say that automated data processing has evolved in such a way that there are efficiencies connected to technology. That's not disputed here, but that's not enough. The standard is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. The attack by the plaintiff appellant here is really a broad attack on the economics of the mutual fund industry, economics into which this advisor and its affiliated distributor, the defendant's appellees here, fit in very nicely, compare very favorably. That's not, we submit respectfully, what Section 36B is about. What Section 36B is about is a circumstance where mutual fund shareholders are exploited in a certain way that departs, that deviates. The broad attack on large mutual funds, generalized allegations regarding excessiveness, disproportionality, the plaintiff appellant here failed to plead disproportionality. The Morningstar authorities on which they cite, not the portions they cite, on which they rely rather, make clear this is among the cheapest alternatives. That's not something that can give rise to a well-pledged 36B claim we submit. Okay. Thank you very much. I appreciate the argument. If we could put two minutes on the clock for Plaintiff's Counsel. Your Honors, first of all, this is not an attack on the economics of the mutual fund industry. In fact, this complaint demonstrates that the industry operates in an appropriate manner. The problem is that this management company and this fund are not within the bounds of the rest of the industry. And that's the key allegation of our complaint. Compare what these people charge and what their peers charge. And when I talk about their peers, I'm not only talking about Vanguard. I'm talking about Fidelity. I'm talking about American funds. I'm talking about all of the funds of comparable size to these. I'm trying to put this down into something that I understand. State farm auto insurance hires lawyers all across the country to defend personal injury claims. And let's say that in Tucson, Arizona, they hire two different firms. And they both bring motions for summary judgment. They succeed. And they both send a bill. And one bill is four times higher than the other. You can look at what was done and determine whether it's disproportionate or not. How are we supposed to do this based on the complaint? If your honors will look at the chart on page 34 of the second amended complaint, which is appendix page 63. We compare the Davis Fund with six other managed funds. I.e., managed funds means funds that have active management that manages the portfolio, chooses the securities within that portfolio, and provides the same services that this fund provided. And as you can see, this fund is the outlier. The fees that were charged annually from 2006 through 2010, that's a five-year period, were in each and every year, except in one instance, were higher. And in comparison to the average and in comparison to these other funds, these fees are way out of line. Now, I would say to you, to your honors' question about the lawyer's fee, the same thing. If the same motion was made to dismiss the summary judgment or to dismiss the complaint, and the lawyer charged $2,000 and the other guy charged $10,000, one would have to say that there's something disproportionate about the other charge because he didn't provide anything extra. And these people didn't provide anything extra. On a different issue, but just, and it may be outside the record, but did your client at any point address a letter or have some communication with the fund asking them for the specifics of the services rendered? No, Your Honor, did not. This concern with the services rendered, I know it's in the language of the courts, but they're not talking about something that's unique or unusual. These defendants here have never argued, and the brief doesn't argue, the court never found that there was anything peculiar or unusual about the services they provided that were any different than the services of their six-peer group. They were exactly the same services. They just didn't do as well and they charged more. That's the end result of all of the analysis. And when you see somebody who's not performing as well and charging more and you don't go to him and say to him, hey, you've got to reduce your fees dramatically because you're out of line, which is what the director should have done here, then we have a situation where there was no arm's-length bargaining and the fees are disproportionate. The complaint is replete with statistics that show the disproportionality. Where in either the amended complaint or the proposed second amended complaint do you allege what you just said, which was that the services are identical? My Honor, we'll turn to pages 52 through 54 of the record, which is pages 20 to 23 of the proposed amended complaint. This addresses itself to the most important service that funds of this character provide, and that is the management of the portfolio.   I'm looking at that. I'm still not finding so far exactly what you just said. This is an abstract discussion of what services funds in general might incur. It says that... Where does it say that the services provided by this fund were identical or substantially identical to those that you do the comparison with? If you look at paragraph 98, the strategy and its performance essentially is that of an index fund. You're not talking about services there. You're talking about the other part of the equation, the performance part. Paragraph 101, 102, and 103. Well, you say... I don't see anything other than 102. 101, we say that the fund invested in a limited number of securities because of the fact that it limited its investment universe to domestic companies of more than $10 billion. Just to take that as an example, I don't see what follows from that. You could have a fund that did intensive research on a limited number of companies, or you could have a fund that did superficial research on a great many companies. You need to know more. I appreciate the fact that it may not have been information readily available to you, and that's an important point. Assuming you could have found out, I don't see anything here that really tells you how to make the comparison on the service part. There's the performance part and the service part. You want us to make a comparison between various funds. The performance part we know because it's public record. The service part we don't know, and you haven't given us any help here. Your Honor, let me try to answer, which is really two questions in one way. When you're talking about funds of this nature, the principal service that they provide is management of the portfolio. People send in checks to buy new shares. They call up for information about their investment, for which they are provided an 800 number and similar services. There's nothing unique about these kinds of services. You are asserting that here in this Court. You did it earlier in your argument. Does it have to be in your complaint? I think, Your Honor, it's a given in the industry. It may be, but for those of us who, strange to say, don't spend all our time studying the industry of mutual funds, doesn't it have to be in your complaint? First of all, we allege, and the Court can infer from this, we allege that the fund is comparable to these other funds in the services that are provided and in all factors. Your colleague is about to help you out. My colleague points out at page 51. Now, which talk we're talking? Paragraph 90. Of the proposed? Of the Second Amendment. It's page 51 of the exhibit. Yeah, hold on. Go ahead. It says, the fund's advisor provides the same types of services as other similar advisors, but the nature and quality of the services provided by the advisor to the fund and its shareholders has been inferior, both in absolute and relative terms, vis-à-vis the nature and quality of the services provided by other advisors to the peer group of mutual funds during the time period 206 to 211 when the fund has grossly underperformed its peers. That tells us that you think they didn't do a good job. But it says that, number one, they didn't do a good job, but number two, that there's nothing special about them in terms of services. Okay. All right. Any other questions? Okay. Sorry that I didn't pick that up sooner, but I knew it was there somewhere. I just couldn't find it. Okay. Thank you, counsel, for your argument. Thank you, Your Honor. The case just argued will stand submitted. The last case on the calendar, United States XRL Thomas v. Shoshone Tribes of the Duck Valley Indian Reservation has been submitted on the briefs, so that means we are at recess for today. Thank you.
judges: Rakoff, Hawkins, Watford